RECEIVED
USDC, WESTERN DISTRICT OF LA
TONY R. MOORE, CLERK
DATE 8 / 1 / 14
      JDB

UNITED STATES DISTRICT COURT                    b

WESTERN DISTRICT OF LOUISIANA

LAKE CHARLES DIVISION

CYNTHIA BASS,                    CIVIL ACTION
          Appellant             NO. 2:13-CV-01166

VERSUS

U.S. COMMISSIONER OF            JUDGE JAMES T. TRIMBLE
SOCIAL SECURITY,                MAGISTRATE JUDGE JAMES D. KIRK
          Appellee


REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE

Cynthia Bass filed an application for supplemental security income ("SSI") benefits on June 14, 2010 and a disability insurance benefits ("DIB") application on June 23, 2010, when she was 47 years old, alleging a disability onset date of January 1, 2010 (Tr. pp. 9, 109) due to neck and back problems, arthritis, diabetes, asthma, and left leg and knee problems (Tr. p. 132). Bass's application was denied by the Social Security Administration (Tr. p. 57).

A de novo hearing was held before an administrative law judge ("ALJ") on March 27, 2012, at which Bass appeared with a representative and a vocational expert ("VE") (Tr. p. 22). The ALJ found that, although Bass suffers from severe impairments of degenerative disc disease of the spine, osteoarthrosis, diabetes mellitus, and asthma (Tr. p. 11), she has the residual functional capacity to perform light work except that she needs to sit or stand alternately, provided she is not off-task more than ten percent of the time, and she can only occasionally climb, stoop,

crouch, kneel and crawl, she can frequently balance, and she should avoid concentrated exposure to irritants (Tr. p. 13).  The ALJ found that Bass can still perform her past relevant work as a service clerk, secretary, and timekeeper (Tr. p. 15), and concluded that Bass was not under a disability as defined in the Social Security Act at any time from January 1, 2010 through the date of the ALJ's decision on April 24, 2012 (Tr. pp. 16-17).

Bass requested a review of the ALJ's decision, but the Appeals Council declined to review it (Tr. p. 1), and the ALJ's decision became the final decision of the Commissioner of Social Security ("the Commissioner").

Bass next filed this appeal for judicial review of the Commissioner's final decision (Doc. 11).  Bass sets forth the following issues for review on appeal:

> 1. The ALJ's step four finding, that Bass retained the residual functional capacity to perform light work activity and, therefore, her past relevant sedentary work, is not supported by substantial evidence.

> 2. The ALJ posited a defective hypothetical question which failed to incorporate findings regarding the frequency with which plaintiff can sit/stand and walk in a regular work day or at one time, pursuant to SSR 96-8p.

The Respondent filed a response to Bass's appeal (Doc. 11), and Bass filed a reply (Doc. 14).  Bass's appeal is now before the court for disposition.

<u>Eligibility for Benefits</u>

To qualify for SSI benefits, a claimant must file an application and be an "eligible individual" as defined in the Act. 42 U.S.C. 1381(a).  Eligibility is dependent upon disability,

income, and other financial resources.  42 U.S.C. 1382(a).  To establish disability, plaintiff must demonstrate a medically determinable physical or mental impairment that can be expected to last for a continuous period of not less than 12 months.  Plaintiff must also show that the impairment precludes performance of the work previously done, or any other kind of substantial gainful employment that exists in the national economy.  42 U.S.C. 1382(a)(3).

To qualify for disability insurance benefits, a plaintiff must meet certain insured status requirements, be under age 65, file an application for such benefits, and be under a disability as defined by the Social Security Act.  42 U.S.C. 416(I), 423.  Establishment of a disability is contingent upon two findings.  First, a plaintiff must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months.  42 U.S.C. 423 (d)(1)(A).  Second, the impairments must render the plaintiff unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy.  42 U.S.C. 423(d)(2).

<u>Summary of Pertinent Facts</u>

Bass was 49 years old at the time of her March 27, 2012 administrative hearing, had a high school education, and had past relevant work as a care giver, cashier, clerical/teller, a receptionist, a dispatcher, a timekeeper, and a security guard (Tr. pp. 26, 133, 144).

3

### 1. Medical Records

In September 1999, an MRI of Bass's lumbar spine showed degenerative disc disease at L4-5, mild diffuse bulging of the disc at L4-5, a small focal bulge/herniation of the disc laterally on the right which appeared to be resulting in minimal mass effect upon the L4 nerve root, no foraminal encroachment, and mild facet joint hypertrophy (Tr. pp. 476, 483).

In June 2002, an MRI of Bass's cervical spine appeared to show mixed hard and soft disc herniation eccentric to the left at C5-6 (but clinical correlation was needed) and mild central canal stenosis at C4-5 (Tr. pp. 477, 482).  X-rays and an MRI of Bass's left knee showed mild degenerative arthritic changes but no joint effusion (Tr. pp. 478, 481, 484).

In June 2004, X-rays of Bass's right ankle showed degenerative changes, a questionable non-displaced fracture of the distal fibula, and a slight irregularity of the medial aspect of the talar dome (Tr. p. 486).

In January 2005, Bass was treated by Dr. John Adams, a family practitioner in Texas, for chronic neck pain, radiculopathy, carpal tunnel syndrome, and chronic low back pain; he prescribed Lorcet, Soma and Xanax (Tr. p. 261).  In February 2005, Dr. Adams diagnosed a herniated nucleus pulposus, central canal stenosis, chronic neck pain, radiculopathy, carpal tunnel, chronic lower back pain, disc bulge at L4/5, possible mass effect at L4, and arthritis of the knee, and continued Bass's medications; Bass weighed 244 pounds (Tr. p. 260).  Bass did not report any medication side effects, so

4

Bass was continued on the same treatment through November 2009, with the additions of Valium and B-12 injections for anxiety and Ibuprofen for pain (Tr. pp. 208-261). In July 2007, Bass reported that her pain was a two with medication and she was able to do ninety percent of the activities of daily living with medication, but her pain was a nine without medication and she was able to do less than thirty percent of the activities of daily living without medication (Tr. p. 231).

In February 2009, Bass had bronchitis (Tr. pp. 297-303); Bass had a normal sinus rhythm and her heart and lungs appeared normal (Tr. pp. 301-304). In July 2009, Bass went to the emergency room with complaints of chest pain, nausea and shortness of breath; Bass weighed 242 pounds, her blood pressure was 144/99, and her history of hyperlipidemia was noted (Tr. pp. 279-281). An ECG was atypical (Tr. p. 289), and an x-ray of Bass's chest/thorax did not show any active chest disease (Tr. p. 294). Bass was diagnosed with panic disorder and atypical chest pain and prescribed Motrin (Tr. pp. 286-287).

X-rays of Bass's cervical spine in February 2009 showed no acute findings, and well-maintained alignment and disc spacing (Tr. p. 326).

In August 2009, Bass complained of neck pain and spasms radiating to her left arm and shoulder, as well as chest pain for three days, and being out of medication; she was 5'5" tall, weighed 245 pounds, and her blood pressure was 135/75 (Tr. pp. 364, 605). Also in August 2009, Bass's glucose was high (Tr. p. 383). An ECG

5

was normal (Tr. p. 398), chest x-rays were normal (Tr. p. 327, 503), and left shoulder x-rays were normal (Tr. pp. 328, 504). Bass was diagnosed with atypical chest pain and left shoulder bursitis (Tr. p. 610).

In September 2009, Bass complained of hypertension and bilateral hand pain; her blood pressure was 141/85 and she weighed 248 pounds (Tr. p. 362).  In October 2009, Bass was diagnosed with diabetes mellitus, hypertension and obesity (Tr. p. 358).  X-rays of Bass's cervical spine showed well-maintained alignment and disc spaces and no acute findings (Tr. p. 502).

In November 2009, Bass's glucose and cholesterol were both high (Tr. p. 381).  In January 2010, Bass had a "borderline" ECG (Tr. p. 410), and weighed 256 pounds (Tr. p. 457).

In February 2010, Bass's cholesterol and triglycerides were high (Tr. pp. 380-381).  Bass was treated in the emergency room on February 1, 2010 for left knee pain up to her left buttock for three days (Tr. pp. 268-270).  Bass was 5'5" tall, weighed 246 pounds and ambulated without noticeable distress; she was prescribed Motrin, Lortab, Prednisone, and Pepcid (Tr. pp. 268-272).  Bass was also diagnosed with diabetes mellitus and hypertension (Tr. p. 353).  An x-ray of Bass's left tibia was negative (Tr. p. 278), x-rays of Bass's right and left knees were negative (Tr. pp. 401, 500), and x-rays of Bass's lumbar spine showed mild lower lumbar facet hypertrophy bilaterally at L4-5 and L5-S1 but well-maintained alignment and disc spacing (Tr. pp. 402, 501).

In March 2010, Bass again went to the emergency room with complaints of chest pain; Bass was scheduled for tests, diagnosed with panic disorder, and prescribed Xanax (Tr. pp. 340-345, 598, 603). Bass underwent an ECG that was normal (Tr. p. 399) and x-rays of her chest were normal (Tr. pp. 400, 499).

In April 2010, Bass weighed 250 pounds and her blood pressure was 133/62 (Tr. p. 337). Bass underwent a cardiac stress test; the test was terminated after less than three-and-a-half minutes due to shortness of breath; Bass had poor functional capacity, but did not experience any chest discomfort (Tr. pp. 320, 397, 525-527).

In June 2010, Bass again went to the emergency room with complaints of chest pain, shortness of breath, and blurred vision; her blood pressure was 120/72 (Tr. pp. 312, 592). X-rays of Bass's chest were negative (Tr. pp. 385, 507). Also in June 2010, Bass had three sebaceous cysts removed from her head (Tr. pp. 317-319, 334-335, 491-498). Shortly thereafter, Bass returned to the emergency room and was diagnosed with mild anxiety, atypical chest pains, and sinusitis, and was prescribed Xanax for her anxiety (Tr. p. 329). Bass's glucose was high (Tr. pp. 366, 371, 375, 407).

In August 2010, Bass's blood pressure was 125/71 and she weighed 255 pounds (Tr. p. 513).

In October 2010, Bass had a disability examination with Dr. Amanda Steen (Tr. p. 412). Dr. Steen noted that Bass was taking Neurontin, Pravastatin, Lisinopril, Aspirin, Metformin, and Xanax (Tr. p. 413). Bass was 5'5" tall, weighed 254 pounds, her blood pressure was 128/84, she ambulated without difficulty, she had a

full range of motion in her neck, she had 98 percent oxygen saturation on room air, her heart was normal, she did not have any swelling or crepitus in her extremities or knees, she had thirty degree flexion forward at the waist, she was very tight and tender along the lumber paraspinal muscles (right worse than left) but her gait was normal, her grip was 5/5 bilaterally with normal manual dexterity and grasping ability, and her range of motion in all major joints (fingers, wrists, elbows, shoulders, low back, hips, knees and ankles) was without limitation (Tr. p. 414). Chest x-rays showed mild anterior degenerative disease of the thoracic spine with anterior bony spurring, normal knee joint spaces with minimal medial and lateral degenerative joint disease along the femur and tibia, and mild anterior bony spurring and mild end plate sclerosis with preservation of joint space height and vertebral body height in the lumbosacral spine (Tr. p. 415).

Dr. Steen diagnosed axial neck pain without evidence of radiculopathy or motor weakness, axial low back pain without evidence of radiculopathy or motor weakness, mild degenerative joint disease and arthritis without bony abnormalities or bony deformities, diabetes, asthma without hypoxia at rest, left knee pain without joint crepitus or abnormalities, and morbid obesity (Tr. p. 415). Dr. Steen concluded that Bass has no physical impairments or functional activity limitations and does not require an assistive device for ambulation (Tr. p. 415).

Also in October 2010, Bass went to the emergency room with complaints of "sharp pains" in her side for two days (Tr. pp. 428,

580). Bass had a negative chest x-ray (Tr. pp. 446, 505), a normal gallbladder ultrasound (Tr. pp. 447, 506), and was told to maintain a bland diet (Tr. pp. 432, 584-585). A week later, Bass was treated in the emergency room for complaints of a numb left arm and swelling feet for two to three days (Tr. pp. 422, 579). Bass, who was wearing flip flops, was advised to wear proper shoes such as athletic shoes (Tr. p. 455). Bass's glucose was high (Tr. p. 443). Bass was found to not have any loss of protective sensation in her feet (Tr. p. 456).

In December 2010, Bass's glucose was high (Tr. p. 441). In February 2011, Bass's LDL cholesterol was high (Tr. p. 441).

Bass was referred to the cardiology clinic in the University Medical Center in Lafayette, Louisiana in January and February 2011 (Tr. pp. 460, 468). In January, Bass's blood pressure was 126/85, her weight was 252 pounds, her waist was 47 inches, and her BMI was 41.9 (Tr. p. 468). Bass complained of chest pain that was "stabbing/pressing" and radiating to her back; Bass also reported having morning chest pain, with dizziness and blurry vision that lasts ten minutes to half a day, that is aggravated by exertion and relieved by rest (Tr. p. 468). Bass also reported two to three episodes per week of palpitations or sweating (Tr. p. 468). A CT angiogram showed non-obstructive disease in the left anterior descending artery and a preserved ejection fraction (Tr. pp. 487-488). In February 2011, Bass's blood pressure was 121/83, she weighed 250.4 pounds, her waist was 48.5 inches, her BMI was 42 (Tr. p. 460), her history of asthma was noted (Tr. p. 461), and she

9

was diagnosed with atypical angina (Tr. p. 460).

In March 2011, Bass was diagnosed with cervical paraspinal muscular strain (Tr. pp. 489-490).  She had a normal ECG (Tr. p. 550).

In June 2011, Bass's blood pressure was 112/57 and she weighed 248 pounds (Tr. p. 514).  In July 2011, Bass's glucose and cholesterol were high (Tr. pp. 547-548).

In September 2011, Bass's chest x-rays were normal (Tr. p. 509).  However, pulmonary function studies showed that Bass has moderate obstructive airways disease, but bronchodilators brought her diffusing capacity to normal (Tr. pp. 543-544).

In September and October 2011, Bass' glucose was high (Tr. pp. 535-536, 539-540).  In December 2011, Bass' blood pressure was 110/64 and her weight was 238 pounds (Tr. p. 512).

## 2. 2010 Administrative Hearing

At her March 2010 administrative hearing, Bass testified that she was 49 years old, widowed, and lived alone (Tr. p. 26).  Bass testified that she was 5'5" tall and weighed about 247 pounds (Tr. p. 27).  Bass testified that she has a twelfth grade education, does not have any income, receives food stamps, is not working, and last worked in early 2010 in a school cafeteria  (Tr. pp. 27-28). Bass testified that she can no longer work as a sitter because she cannot lift a patient (Tr. p. 28).

Bass testified that she has difficulty sitting, standing and walking due to back pain (Tr. p. 29).  Bass testified that she takes pain medication sometimes, mostly at night so she can rest

(Tr. p. 29). Bass testified that surgery has not been recommended for her back, and she does not receive any other treatment such as injections or physical therapy (Tr. p. 29).

Bass also testified that she does not take insulin for her diabetes, but takes Metformin and Glimarapride, and that her blood sugar has not been under control (Tr. pp. 29-30). Bass testified that, when her blood sugar fluctuates too much, she becomes very weak and has to sit or lay down (Tr. pp. 29-30).

Bass testified that, for her asthma, she has an Albuterol inhaler, an Advair inhaler, and a Spiriva inhaler; the Albuterol is for emergency use only (Tr. p. 30). Bass testified that she has gone to the emergency room a couple of times for her asthma, but generally the Albuterol inhaler relieves her symptoms (Tr. pp. 30-31).

Bass testified that she has arthritis in her neck and left knee, for which she takes over-the-counter medications (Tr. p. 31). Bass also takes Amitriptyline and Alprozolam for depression and anxiety, but they do not really help (Tr. pp. 31-32). Bass testified that she was sent to a cardiac clinic for testing and learned she does not have a cardiac problem (Tr. p. 32).

Bass testified that she cannot work because she becomes very short-winded, she cannot stand for long periods of time, she does not rest well at night, she has lower back pain anc neck pain all of the time, it is difficult for her to get up and down due to the arthritis in her knee, she has bad headaches, and her hands get numb every day (especially the left) (Tr. pp. 32-33). Bass

11

testified that the numbness in her hands is caused by either a pinched nerve or carpal tunnel syndrome (Tr. p. 33).

Bass testified that her general practice doctor treats her for anxiety and depression, and she does not have any money to go to a mental health clinic (Tr. pp. 31-33). Bass further testified that her ability to breathe is affected by having a fan blowing on her, she is always short of breath, she becomes very short of breath when she walks or exerts herself (Tr. p. 34). When she has an asthma attack, Bass's throat starts to close up and she feels like she cannot breathe for up to five minutes (Tr. p. 34).

A vocational expert ("VE") testified that Bass's past work as a security guard (DOT[1] 372.667-034) was semi-skilled, light, SVP[2] 3, her past work as a service clerk (DOT 221.367-070) was semi-skilled, sedentary, SVP 4, her past work as a secretary (DOT 201.362-030) was sedentary, skilled, SVP 6, her past work as a home attendant (DOT 354.377-014) was medium, semi-skilled, SVP 3, and her past work as a timekeeper (DOT 215.362-022) was sedentary, semi-skilled, and SVP 3 (Tr. p. 35).

The ALJ posed a hypothetical involving a claimant with the residual functional capacity to lift/carry up to twenty pounds occasionally and ten pounds frequently, who needs to sit or stand

---

[1] Dictionary of Occupational Titles.

[2] SVP, or Specific Vocational Preparation, refers to the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a particular occupation. See, Dictionary of Occupational Titles ("DOT"), App. C (rev. 4th ed. 1991).

as needed provided she is not off-task more than ten percent of the work period, can only occasionally climb, stoop, crouch, kneel, or crawl, can frequently balance, and must avoid concentrated exposure to irritants (Tr. p. 36).  The VE testified that such a person could do Bass's past work as a service clerk, secretary, or timekeeper, which are all sedentary jobs, and that the secretary and the timekeeper jobs are in controlled environments (Tr. p. 36).

The ALJ posited a second hypothetical involving a person with Bass's age, education and work experience, and with the same residual functional capacity described before.  The VE testified that such a person could also work as a marker (DOT 209.587-034), which is unskilled, SVP 2, light duty (2,753 jobs in Louisiana. 210,584 jobs in the U.S.), an information clerk (DOT 237.367-018), which is unskilled, SVP 2, light duty (1,298 jobs in Louisiana, 108,347 jobs in the U.S.), or an order caller (DOT 209.667-014), which is unskilled, SVP 2, light duty (2,853 jobs in Louisiana, 224,097 jobs in the U.S.) (Tr. pp. 36-37).

The VE further testified that, if the claimant had to miss two to three days of work each month, she would not be able to maintain employment (Tr. p. 37).

## ALJ's Findings

To determine disability, the ALJ applied the sequential process outlined in 20 C.F.R. §404.1520(a) and 20 C.F.R. §416.920(a).  The sequential process required the ALJ to determine whether Bass (1) is presently working; (2) has a severe impairment; (3) has an impairment listed in or medically equivalent to those in

13

20 C.F.R. Pt. 404, Subpt. P, App. 1 ("Appendix 1"); (4) is unable to do the kind of work she did in the past; and (5) can perform any other type of work.  If it is determined at any step of that process that a claimant is or is not disabled, the sequential process ends.  A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis.  Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994), cert. den., 914 U.S. 1120, 115 S.Ct. 1984, 131 L.Ed.2d 871 (1995), citing Lovelace v. Bowen, 813 F.2d 55, 58 (5th Cir.1987).

To be entitled to benefits, an applicant bears the initial burden of showing that she is disabled.  Under the regulations, this means that the claimant bears the burden of proof on the first four steps of the sequential analysis.  Once this initial burden is satisfied, the Commissioner bears the burden of establishing that the claimant is capable of performing work in the national economy.  Greenspan, 38 F.3d at 237.

In the case at bar, the ALJ found that Bass has not engaged in substantial gainful activity since January 1, 2010 and that she has severe impairments of degenerative disc disease of the spine, osteoarthrosis, diabetes mellitus, and asthma, but that she does not have an impairment or combination of impairments listed in or medically equal to one listed in Appendix 1 (Tr. pp. 11-13).  The ALJ then found that Bass can perform light work except that she must be able to sit/stand alternatively as needed provided she is not off-task more than ten percent of the time, she can only

occasionally climb, stoop, crouch, kneel and crawl, she can frequently balance, and she should avoid concentrated exposure to irritants (Tr. p. 17). The ALJ concluded that Bass is still able to perform her past relevant work as a service clerk, secretary or timekeeper (Tr. p. 15). The sequential analysis thus ended at Step 4, with a finding that Bass is not disabled (Tr. p. 16).

## Scope of Review

In considering Social Security appeals such as the one that is presently before the Court, the Court is limited by 42 U.S.C. §405(g) to a determination of whether substantial evidence exists in the record to support the Commissioner's decision and whether there were any prejudicial legal errors. McQueen v. Apfel, 168 F.3d 152, 157 (5th Cir. 1999). For the evidence to be substantial, it must be relevant and sufficient for a reasonable mind to support a conclusion; it must be more than a scintilla but need not be a preponderance. Falco v. Shalala, 27 F.3d 160, 162 (5th Cir. 1994), citing Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 482 (1971). Finding substantial evidence does not involve a simple search of the record for isolated bits of evidence which support the Commissioner's decision but must include a scrutiny of the record as a whole. The substantiality of the evidence must take into account whatever in the record fairly detracts from its weight. Singletary v. Bowen, 798 F.2d 818, 823 (5th Cir. 1986).

A court reviewing the Commissioner's decision may not retry factual issues, reweigh evidence, or substitute its judgment for

that of the fact-finder.  <u>Fraga v. Bowen</u>, 810 F.2d 1296, 1302 (5th Cir. 1987); <u>Dellolio v. Heckler</u>, 705 F.2d 123, 125 (5th Cir. 1983). The resolution of conflicting evidence and credibility choices is for the Commissioner and the ALJ, rather than the court.  <u>Allen v. Schweiker</u>, 642 F.2d 799, 801 (5th Cir. 1981).  Also, <u>Anthony v. Sullivan</u>, 954 F.2d 289, 295 (5th Cir. 1992).  The court does have authority, however, to set aside factual findings which are not supported by substantial evidence and to correct errors of law. <u>Dellolio</u>, 705 F.2d at 125.  But to make a finding that substantial evidence does not exist, a court must conclude that there is a "conspicuous absence of credible choices" or "no contrary medical evidence."   <u>Johnson v. Bowen</u>, 864 F.2d 340 (5th Cir. 1988); <u>Dellolio</u>, 705 F.2d at 125.

<u>Law and Analysis</u>

<u>Issue 1 - Residual Functional Capacity</u>

First, Bass contends the ALJ erred in finding she has the residual functional capacity to perform light work and, therefore, can return to her past relevant sedentary work.  Bass contends that, although the ALJ found she can sit or stand alternatively as needed provided she is not off-task more than ten percent of the time, the ALJ failed to identify the frequency of her standing, walking, and sitting capacities.  Bass also argues that sedentary work requires the ability to sit up to six hours in an eight-hour day.

A claimant's impairments may cause physical or mental limitations that affect what he can do in a work setting.  Residual

functional capacity is a medical assessment, based upon all of the relevant evidence, of the work a claimant can perform despite his or her limitations. 20 C.F.R. §404.1545, §416.945. The burden of proof in a disability case is on the claimant to show that she is unable to perform her usual line of work. Once that fact is established, the burden shifts to the Commissioner to show that the claimant is able to perform some other kind of substantial work available in the national economy. Herron v. Bowen, 788 F. 2d 1127, 1131 (5th Cir. 1986), and cases cited therein. Also, Babineaux v. Heckler, 743 F.2d 1065, 1067 (5th Cir. 1984). The Commissioner has the burden to establish a claimant's residual functional capacity. Leggett v. Chater, 67 F.3d 558, 565 (5th Cir. 1995).

In the case at bar, the ALJ's finding that Bass can perform her past relevant work indicates the ALJ's conclusion that Bass did not meet her burden of proving that she could not return to such work. The ALJ concluded that Bass can perform her past sedentary work, which is defined as being able to sit up to six hours per day, 20 C.F.R. § 404.1567(a). Having to alternate between sitting and standing in order to work the entire day does not fit within the definition of sedentary work. Ripley v. Chater, 67 F.3d 552, 557 n.25 (5th Cir. 1995), citing Scott v. Shalala, 30 F.3d 33, 34 (5th Cir. 1994). However, the ALJ included the sit/stand provision in the hypothetical to the VE, who apparently found that Bass would be able to perform her past relevant work even with the sit/stand provision.

The value of a vocational expert is that he is familiar with the specific requirements of a particular occupation, including working conditions and the attributes and skills needed. A vocational expert is able to compare all the unique requirements of a specified job with the particular ailments a claimant suffers in order to reach a reasoned conclusion whether the claimant can perform the specific job. <u>Fields v. Bowen</u>, 805 F.2d 1168, 1170 (5th Cir. 1986), and cases cited therein. A claimant is not disabled under the Social Security Act if she can perform her past relevant work either as she actually performed it, or as the work is ordinarily performed in the national economy. Social Security Ruling 82-61. Also, <u>Leggett v. Chater</u>, 67 F.3d 558, 564 (5th Cir. 1995).

The VE's testimony in this case, that Bass can work as a secretary, timekeeper, or service clerk despite her functional limitations, is substantial evidence which supports the ALJ's finding that Bass can perform her past relevant sedentary work.

Also, the fact that sedentary work is defined as work which involves sitting up to six hours in an eight-hour day is likewise irrelevant, since the VE found that Bass would be able to perform her specific past sedentary jobs as a secretary, a timekeeper, or a service clerk with a sit/stand option.

Bass contends the ALJ failed to identify the "frequency" of her need to sit or stand in the hypothetical to the VE, in

accordance with Social Security Ruling 96-9P.[3]  However, no doctor imposed physical limitations on Bass and Bass did not testify that she needs to alternated sitting and standing.  Bass only stated that she has "difficulty" sitting, standing and walking due to back pain.  The ALJ gave Bass the benefit of the doubt and found she needs a sit/stand option.  The sit/stand option allows Bass to set the frequency of her need to stand up.  The ALJ consulted a VE, in accordance with SSR 96-9P, to determine whether Bass would be able to work despite her need for a sit/stand option and other limitations.

Bass also contends she is unable to perform the full range of sedentary work.  The fact that Bass is not able to perform the "full range" of sedentary work is irrelevant, since the VE testified that she can perform her past work as a secretary, timekeeper or service clerk.

Finally, Bass argues there is no evidence that she was able to employ a sit/stand option in her past sedentary work.  However, the

---

[3] Social Security Ruling 96-9P states in pertinent part: "Alternate sitting and standing: An individual may need to alternate the required sitting of sedentary work by standing (and, possibly, walking) periodically. Where this need cannot be accommodated by scheduled breaks and a lunch period, the occupational base for a full range of unskilled sedentary work will be eroded. The extent of the erosion will depend on the facts in the case record, such as the frequency of the need to alternate sitting and standing and the length of time needed to stand. The RFC assessment must be specific as to the frequency of the individual's need to alternate sitting and standing. *It may be especially useful in these situations to consult a vocational resource in order to determine whether the individual is able to make an adjustment to other work*." [Emphasis added.]

VE testified that Bass would be able to perform her past relevant sedentary work as that work is ordinarily performed in the national economy.  It does not matter how Bass actually performed those jobs in that past.  See Leggett, 67 F.3d at 564.

Since substantial evidence supports the ALJ's finding that Bass can perform her past relevant work as a secretary, a timekeeper, or a service clerk, this issue is meritless.

Isssue 2 - Hypothetical

Next, Bass contends the ALJ posited a defective hypothetical question which failed to incorporate findings regarding the frequency with which Bass can sit/stand and walk in a regular work day or at one time, pursuant to Social Security Ruling 96-8.  Bass contends that, since the ALJ proceeded to Step 5 and asked the VE whether there are any other jobs that Bass can perform, the ALJ should have posed a correct hypothetical to the VE.

Since the ALJ found Bass can perform her past relevant work, his evaluation ended at Step 4.  Therefore, the issue of whether the ALJ posited a defective hypothetical to the VE at Step 5 is moot.

This issue is meritless.

Conclusion

Based on the foregoing discussion, IT IS RECOMMENDED that the final decision of the Commissioner be AFFIRMED and that Bass' appeal be DENIED.

Under the provisions of 28 U.S.C. § 636(b)(1)(c) and Fed.R.Civ.P. 72(b), the parties have **fourteen (14) business days**

from service of this Report and Recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within **fourteen (14) days** after being served with a copy thereof.  No other briefs (such as supplemental objections, reply briefs etc.) may be filed. Providing a courtesy copy of the objection to the magistrate judge is neither required nor encouraged.  Timely objections will be considered by the district judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN fourteen(14) BUSINESS DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

THUS DONE AND SIGNED at Alexandria, Louisiana, on this _____ day of August 2014.

JAMES D. KIRK
UNITED STATES MAGISTRATE JUDGE